# Exhibit I-1

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

Gregory S. Tamkin (SBN 175009)
*tamkin.greg@dorsey.com*
**DORSEY & WHITNEY LLP**
1400 Wewatta Street, Suite 400
Denver, CO 80202-5549, tel. (303) 629-3400

Shannon L. Bjorklund (admitted *Pro Hac Vice*)
*bjorklund.shannon@dorsey.com*
**DORSEY & WHITNEY LLP**
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498, tel. (612) 340-2600

Maral J. Shoaei (SBN 345117)
*shoaei.maral@dorsey.com*
**DORSEY & WHITNEY LLP**
167 Hamilton Avenue, Suite 200
Palo Alto, CA 94301, tel. (303) 352-1146

Kent Schmidt (SBN 195969)
*schmidt.kent@dorsey.com*
**DORSEY & WHITNEY LLP**
600 Anton Boulevard, Suite 2000
Costa Mesa, CA 92626-7655, tel. (714) 800-1400

Attorneys for Plaintiff
Biomedical Device Consultants &
Laboratories of Colorado, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Biomedical Device Consultants & Laboratories Of Colorado, LLC | CASE NO: 2:23-CV-04291-RGK-E |
| | Hon. Judge R. Gary Klausner |
| *Plaintiff,* | |
| vs. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| ViVitro Labs, Inc. | |
| *Defendant.* | **Filed Concurrently Herewith:** |
| | **1. Notice and Motion**<br>**2. Declaration of Craig Weinberg**<br>**3. Declaration of Michael Girard** |
| | **Date:** **July 24, 2023**<br>**Time:** **9:00 a.m.**<br>**Ctrm:** **850** |

# **TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................. 1

II.  FACTUAL BACKGROUND ........................................................................... 1

   A.   Field of Technology and BDC's Role ..................................................... 1

   B.   BDC Creates the '935 Invention ............................................................ 2

   C.   BDC's Heart Valve Durability Tester Disrupts the Market ..................... 3

   D.   Defendant's ADC Heart Valve Durability Tester Infringes the '935
        Patent and Competes Against BDC's VDT-3600i .................................. 4

   E.   BDC Attempts to Stop the Irreparable Harm Through Negotiation, But
        is Unsuccessful .................................................................................... 4

III. ARGUMENT ................................................................................................. 5

   A.   BDC is Likely to Succeed on the Merits ................................................ 6

      1.   Claim Construction ........................................................................ 6

      2.   Defendant's ADC Heart Valve Durability Tester Infringes at Least
           Claims 1, 2-4, 8-9, 12 and 13 of the '935 Patent ................................ 7

      3.   The '935 Patent is Presumptively Valid, and None of ViVitro's Cited
           Art Raises a Substantial Question, Because It Teaches Away and
           Involves Fundamentally Different Systems ..................................... 10

   B.   BDC Will Suffer Irreparable Harm If the Infringement Is Not Stopped . 12

      1.   Loss of Market Share .................................................................... 13

      2.   Reputational Harm ........................................................................ 14

      3.   BDC Will Lose Incalculable Sales of Related Products/Services as a
           Result of Defendant's Infringement ............................................... 15

      4.   BDC's Grant of a License to TAI Does Not Defeat Irreparable Harm 16

C.    The Balance of Equities Favors Entry of a Preliminary Injunction. ........ 17

D.    The Public Interest Favors Entry of a Preliminary Injunction ................ 18

E.    Bond ........................................................................................................ 18

IV.    CONCLUSION .......................................................................................... 19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acumed LLC v. Stryker Corp.*,
 551 F.3d 1323 (Fed. Cir. 2008) ......................................................... 16

*Apple Inc. v. Samsung Elecs. Co.*,
 809 F.3d 633 (Fed. Cir. 2015) .................................................... 13, 18

*Apple, Inc. v. Samsung Elecs. Co*,
 2012 U.S. Dist. LEXIS 88436 (N.D. Cal. June 26, 2012)................... 17

*Arctic Cat Inc. v. Bombardier Rec. Prods.*,
 876 F.3d 1350 (Fed. Cir. 2017) ......................................................... 12

*Aria Diagnostics v. Sequenom, Inc.*,
 726 F.3d 1296 (Fed. Cir. 2013) ......................................................... 12

*Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*,
 853 F.2d 1557 (Fed. Cir. 1988) ......................................................... 12

*Baker Hughes Inc. v. Nalco Co.*,
 675 F. Supp. 2d 547 (S.D. Tex. 2009)................................................. 16

*Biagro W. Sales, Inc. v. Grow More, Inc.*,
 423 F.3d 1296 (Fed. Cir. 2005) ........................................................... 7

*Bird-B-Gone Inc. v. Bird Barrier Am., Inc.*,
 2013 U.S. Dist. LEXIS 191316 (C.D. Cal. Mar. 20, 2013) .......... 17, 18

*Broadcom Corp. v. Emulex Corp.*,
 732 F.3d 1325 (Fed. Cir. 2013) ......................................................... 13

*Bushnell, Inc. v. Brunton Co.*,
 673 F. Supp. 2d 1241 (D. Kan. 2009) ................................................... 6

*Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*,
 134 F.3d 1085 (Fed. Cir. 1998) ......................................................... 10

*Celsis in Vitro, Inc., v. CellzDirect, Inc.*,
 664 F.3d 922 (Fed. Cir. 2012) .................................................... 12, 18

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
 717 F.3d 1336 (Fed. Cir. 2013) ...............................................13, 14, 15

*Edwards Lifesciences AG v. CoreValve, Inc.*,
    699 F.3d 1305 (Fed. Cir. 2012) .......................................................................14

*Enercon GmbH v. Int'l Trade Comm'n*,
    151 F.3d 1376 (Fed. Cir. 1998) ..........................................................................7

*Gator Tail, LLC v. Mud Buddy LLC*,
    618 F. App'x 992 (Fed. Cir. 2015) ....................................................................12

*Hill v. Xyquad, Inc.*,
    939 F.2d 627 (8th Cir. 1991) ............................................................................18

*Hybritech Inc. v. Abbott Labs.*,
    849 F.2d 1446 (Fed. Cir. 1988) ..........................................................................6

*i4i Ltd. P'ship, v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) ..........................................................................18

*Layne Christensen Co. v. Bro-Tech Corp.*,
    871 F. Supp. 2d 1104 (D. Kan. 2012) ...............................................................16

*LifeNet Health v. LifeCell Corp.*,
    837 F.3d 1316 (Fed. Cir. 2016) ..........................................................................7

*Maismo Corp. v. Apple, Inc.*,
    2020 U.S. Dist. LEXIS 190604 (C.D. Cal. Sept. 16, 2020) ................................6

*Mentor Graphics Corp. v. Eve-USA, Inc.*,
    2015 U.S. Dist. LEXIS 33610 (D. Or. Mar. 17, 2015) ......................................13

*Metalcraft of Mayville, Inc. v. Toro Co.*,
    848 F.3d 1358 (Fed. Cir. 2017) ...............................................................5, 6, 12

*Mylan Inst. LLC v. Aurobindo Pharma Ltd.*,
    857 F.3d 858 (Fed. Cir. 2017) ..........................................................................12

*Mylan Institutional LLC v. Aurobindo Pharm. Ltd.*,
    2016 U.S. Dist. LEXIS 180551 (E.D. Tex. Nov. 19, 2016).................................6

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2015) ..........................................................................7

*Polara Eng'g, Inc. v. Campbell Co.*,
    894 F.3d 1339 (Fed. Cir. 2018) ........................................................................11

*Polymer Techs., Inc. v. Bridwell*,
    103 F.3d 970 (Fed. Cir. 1996) ...................................................................14

*Presidio Components, Inc. v. am. Tech. Ceramics Corp.*,
    702 F.3d 1351 (Fed. Cir. 2012) ...............................................................13

*Revision Military, Inc. v. Balboa Mfg., Co.*,
    700 F.3d 524 (Fed. Cir. 2012) ............................................................6, 17

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
    659 F.3d 1142 (Fed. Cir. 2011) ...................................................6, 12, 18

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002) .................................................................7

*Tinnus Enters., LLC v. Telebrands Corp.*,
    846 F.3d 1190 (Fed. Cir. 2017) .................................................................6

*Titan Tire, Corp. v. Case New Holland, Inc.*,
    566 F.3d 1372 (Fed. Cir. 2009) .........................................................10, 11

*Trading Techs. Int'l., Inc. v. eSpeed, Inc.*,
    2008 U.S. Dist. LEXIS 86953 (N.D. Ill. May 22, 2008)........................14

*Tuf-Tite, Inc. v. Fed. Package Networks, Inc.*,
    2014 U.S. Dist. LEXIS 163352 (N.D. Ill. Nov. 21, 2014) ......................18

*Veeco Instr. Inc. v. SGL Carbon, LLC*,
    2017 U.S. Dist. LEXIS 181935 (E.D.N.Y. Nov. 2, 2017) ........................6

*Waterton Polymer Prods. USA, LLC v. EdiZone*,
    LLC, 2015 U.S. Dist. LEXIS 32830 (D. Utah Mar. 16, 2015) ...............16

**Statutes**

35 U.S.C. § 154..............................................................................................5

35 U.S.C. § 271..............................................................................................7

35 U.S.C. § 282............................................................................................12

35 U.S.C. § 283..............................................................................................5

## I.   INTRODUCTION

Plaintiff Biomedical Device Consultants & Laboratories of Colorado, LLC ("BDC") has revolutionized the market for heart valve durability testers. BDC's best-selling system, the VDT-3600i, is used for testing the durability of prosthetic heart valves and is covered by a family of patents including U.S. Patent No. 9,237,935 ("the '935 Patent", attached as Girard Decl., Ex. B). The technology behind the VDT-3600i made it the market standard, rendering prior products obsolete—including Defendant ViVitro Labs Inc.'s ("Defendant" or "ViVitro") then-offered tester—and earning BDC the dominant market position and a reputation for innovation. Attempting to capitalize on this technology pioneered by BDC, ViVitro is now offering an infringing test system known as the ViVitro ADC™ Heart Valve Durability Tester. ViVitro's infringement must be stopped by a preliminary injunction. If ViVitro is allowed to continue its infringing activities, BDC will suffer an irreparable and irretrievable loss of market position, loss of business opportunities, harm to business relationships, and damage to its reputation as an industry-leading innovator in equipment for the durability testing of heart valves.

BDC filed this lawsuit after trying unsuccessfully for months to stop Defendant's commercialization of the infringing product without court intervention. ViVitro rejected these efforts, continues to market its soon-to-be-launched product at trade shows and, to the best of BDC's knowledge, will be capable of shipping the infringing products this fall. A preliminary injunction is necessary and warranted.

## II.   FACTUAL BACKGROUND

### A.   Field of Technology and BDC's Role

Prosthetic heart valves must be tested to ensure that they will function for the anticipated life of a patient by opening and closing under the flows and pressures present within the human vascular system. Girard Decl., ¶¶6. International testing standards require that prosthetic valves be able to withstand hundreds of millions of open/close cycles (representing years in a human body) with a specific pressure differential when the valve is closed. *Id.*, ¶7. To complete these cycles in a commercially viable timeframe,

durability testing is "accelerated", meaning performed at over 200 beats per minute ("bpm"). While a normal heart beat rate is 70 bpm, the current accelerated testing systems that operate up to 800 bpm can complete this testing in approximately six months. *Id.*, ¶8.

## B.   BDC Creates the '935 Invention

BDC developed a new system that would drive fluid through the system in a circulatory manner—more closely approximating human physiology than other prior art systems—without subjecting the valve to undue pressure. Providing fluid flow through the test valve and pressure across it requires a "drive mechanism" such as a pump that drives fluid into a test chamber. *Id.*, ¶¶13-16. Before commercialization of BDC's, durability testing equipment used drive mechanisms that had limited control over the closing rate and often produced "pressure spikes." These pressure spikes are undesirable because they wear out valves during testing faster than they would be worn out in the human body, causing false test failures. *Id.*, ¶17-18.

BDC revolutionized the market for heart valve durability testing equipment by providing an accelerated testing device utilizing a closed system that can reduce pressure spikes by providing an excess volume area on the outflow side of the valve. Weinberg Decl., ¶5. This excess volume area improves the test environment by mitigating undesirable pressure spikes and increasing speed and longevity in the drive system. *Id.*, ¶¶7-9.

Claim 1 of the '935 Patent describes the "excess volume area" as an area "capable of operating at the accelerated pulsed rate" that provides a "volume for storing a volume of a test system fluid when the test system fluid is under compression." '935 Patent at 17:45-50. Unlike other limitations, which describe structures such as "chambers" and "conduits," the excess volume area is described using spatial terms: it is an *area* or, in three-dimensional terms, a *volume*. As opposed to a specific structure with rigidly defined boundary locations, the excess volume area is where fluid can flow when the system is under compression by the drive system. A portion of Figure 4 of the '935 Patent is depicted below, with the test fluid shown in light blue, and the excess volume—*i.e.*, that

additional portion of test fluid that enters the excess volume area during compression—in darker blue (right is drive stroke, left is decompression).

During the drive stroke, the gas in the compliance chamber is compressed, and a larger portion of the compliance chamber is occupied by fluid than when the piston is in



a decompression stroke. The excess volume area is the area that can be filled with fluid during the drive stroke, and filled with gas when the system is not under compression. When the piston is retracted on its backstroke, the excess volume area returns to being occupied by a compressible gas. '935 Patent at 12:5-39. In this way, the space referred to as the excess volume area is in "fluid communication with the fluid return chamber" when the gas is displaced during system compression. Girard Decl. ¶15.

## C.    BDC's Heart Valve Durability Tester Disrupts the Market

BDC's VDT-3600i heart valve durability tester has become a core component of

BDC's overall business, and is BDC's best-selling medical device test system. Weinberg Decl., ¶¶9-16, 20. The specialized nature of heart valve durability systems means that there are a limited number of competitors in the marketplace. *Id.*, ¶¶17-19. There are currently only three: Defendant ViVitro (which until recently was promoting its obsolete technology), TA Instruments-Waters LLC ("TAI"), and Dynatek Labs. *Id.*, ¶¶15, 25. However, the superior performance of the VDT-3600i has made it the industry standard for heart valve durability testing: it has an estimated 70-75% worldwide market share. *Id.*, ¶16.

Market share is important due to incumbency effects. *Id.*, ¶17. A single testing system can only test a few devices at a time. To bring a new prosthetic valve device to market, medical device manufacturers must test many sample devices and thus need multiple testing systems. *Id.* Customers generally do not use testing equipment from multiple sources, to avoid introducing additional variables (*i.e.*, differences between testing machines from different suppliers) into the test data. *Id.*, ¶18. The lifespan of valve durability testing equipment is 10-15 years, meaning that once a customer has decided which testing equipment to use, it will likely be a long time before a competitor has the opportunity to usurp the place of an incumbent. *Id.*

### D. Defendant's ADC Heart Valve Durability Tester Infringes the '935 Patent and Competes Against BDC's VDT-3600i

ViVitro's infringing ADC Heart Valve Durability Tester is a device for accelerated cyclic testing of a valved prosthetic device comprising (1) a pressure source that drives the test system at an accelerated rate, (2) pressure chambers on each side of the valve, (3) a fluid conduit structurally and fluidly connecting the chambers, and (4) an excess volume area for storing fluid when the fluid is under compression. Girard Decl. at 9:12-13:25. Defendant's test system competes directly with BDC's.

### E. BDC Attempts to Stop the Irreparable Harm Through Negotiation, But is Unsuccessful

Last summer, BDC learned that ViVitro was distributing marketing materials for a

new tester, the ADC Heart Valve Durability Tester. Weinberg Decl., ¶15. In August 2022, BDC sent a letter notifying Defendant of its infringement of the '935 Patent. *Id.*, ¶36. In response, ViVitro claimed that one of BDC's annotations pointed to the wrong feature but did not deny infringement. *Id.*, ¶37. BDC gathered additional information, observed the ADC Heart Valve Durability Tester in operation at a conference in Boston in September 2022, spoke to ViVitro's President at the conference, and sent another letter warning ViVitro of its infringement. *Id.*, ¶¶39-41. Months later—after giving itself multiple unilateral extensions (despite multiple follow-ups by BDC)—ViVitro provided its substantive response. *Id.*, ¶42. Notably, it did not argue that its product did not practice each of the elements of the claims of the '935 Patent, but rather explained that it did not infringe any "valid" claims. Notwithstanding this reference to validity, BDC provided no indication as to why any particular prior art was invalidating. Defendant then attended a trade show in Anaheim, California, and continued to market its ADC Heart Valve Durability Tester. *Id.*, ¶43. Defendant is actively marketing and selling the ADC Heart Valve Durability Tester and expects to deliver the Accused Product in the fall of 2023. *Id.*, ¶44.

## III.   ARGUMENT

The Patent Act provides a patentee with the "right to exclude others from making, using, offering for sale, or selling the [patented] invention." 35 U.S.C. § 154(a)(1). To protect this right, courts "may grant injunctions in accordance with the principals of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. To obtain a preliminary injunction, a patentee must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction would be in the public interest." *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1363 (Fed. Cir. 2017).[1] It makes this showing where the factors are "supported

---

[1] Federal Circuit law governs the substantive aspects a preliminary injunction in a patent case. *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988).

by sound evidence." *Veeco Instr. Inc. v. SGL Carbon, LLC*, 2017 U.S. Dist. LEXIS 181935, *77-78 (E.D.N.Y. Nov. 2, 2017) (citations omitted).[2] Ninth Circuit courts evaluate these factors on a sliding scale: a Plaintiff meets its burden if it "demonstrates either a combination of probable success on the merits and possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in [its] favor." *Maismo Corp. v. Apple, Inc.*, 2020 U.S. Dist. LEXIS 190604, at *5-6 (C.D. Cal. Sept. 16, 2020) (citing *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011)). The Federal Circuit has made clear that district courts must consider "the fundamental nature of patents as property rights granting the owner the right to exclude." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011) (emphasis added). For the reasons set forth below, the Court should enjoin ViVitro to preserve BDC's patent rights and market position.

### A.    BDC is Likely to Succeed on the Merits

To demonstrate a likelihood of success on the merits, BDC must show "that it will likely prove infringement, and that it will likely withstand challenges, if any, to the validity of the patent." *Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1202 (Fed. Cir. 2017). BDC is not required to prove that it is certain to win; it is enough to show that "success is more likely than not." *Revision Military, Inc. v. Balboa Mfg., Co.*, 700 F.3d 524, 526 (Fed. Cir. 2012). As shown below, BDC meets this requirement.

### 1.  Claim Construction

---

Regional Circuit law governs "purely" procedural questions. *Id.*

[2] Sound evidence to support a finding of irreparable harm may include well-founded declarations of the patentee regarding market conditions. *See, e.g., Metalcraft*, 848 F.3d at 1368 (senior marketing manager testified "some customers 'prefer to purchase an entire line of products from the same manufacturer for consistency'"); *Bushnell, Inc. v. Brunton Co.*, 673 F. Supp. 2d 1241, 1262 (D. Kan. 2009) (executive testified that "the market will not allow Bushnell to raise prices to recoup its losses"); *Mylan Institutional LLC v. Aurobindo Pharm. Ltd.*, 2016 U.S. Dist. LEXIS 180551, *70 (E.D. Tex. Nov. 19, 2016) (CFO projected "half or more" of revenue would be lost by infringement).

An infringement analysis proceeds in two parts: first, claim construction, followed by an analysis of "the allegedly infringing product to determine whether the product embodies every limitation of the claims." *Biagro W. Sales, Inc. v. Grow More, Inc*., 423 F.3d 1296, 1301 (Fed. Cir. 2005). The words of the claims "are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp*., 415 F.3d 1303, 1312-14 (Fed. Cir. 2015) *see also Teleflex, Inc. v. Ficosa N. Am. Corp*., 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("a 'heavy presumption' that a claim term carries its ordinary and customary meaning."). No construction is necessary where, as here, "the ordinary meaning of claim language as understood by a person of skill in the art [is] readily apparent even to lay judges." *Phillips*, 415 F.3d at 1314.

### 2. Defendant's ADC Heart Valve Durability Tester Infringes at Least Claims 1, 2-4, 8-9, 12 and 13 of the '935 Patent

A defendant infringes by making, using, offering to sell, selling or importing a patented invention, without consent. 35 U.S.C. § 271(a); *LifeNet Health v. LifeCell Corp*., 837 F.3d 1316, 1325 (Fed. Cir. 2016). At trial, the patentee must prove infringement by a "preponderance of the evidence." *See, e.g., Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1384 (Fed. Cir. 1998).

As set forth in detail in the infringement charts of expert Michael Girard, the ADC Heart Valve Durability Tester practices all limitations of independent claim 1 and dependent claims 2-4, 8-9 and 12-13 of the '935 Patent. It is a "device for accelerated cyclic testing of a valved prosthetic device" that contains a "pressure source," annotated by ViVitro as the "ADC: Automatic Pressure Control and Automatic Stroke Control." Girard Decl. at 9:15-10:20. It contains a pressurizable test chamber with a fluid distribution chamber positioned underneath the prosthetic valve being tested, and a fluid return chamber located above the valve. *Id.* at 11:2-13:10; Ex. F.[3]



---

[3] Mr. Girard's initial infringement analysis was based upon publicly-available information. After ViVitro produced a highly-confidential schematic, Mr. Girard determine that the schematic—copied above and filed as Exhibit F—confirms the infringement analysis.  It provides more detail, and is used here for clarity.

The ADC Heart Valve Durability Tester also contains an "excess volume area," which is the volume adjacent to the annular compliance rings. *Id.* at 13:11-24 & ¶¶29-34. The Accused Product has three hollow compliance rings within the fluid return chamber. The compliance rings are located within the fluid return chamber. These compliance rings are flexible tube structures that must be filled with compressible gas in order to provide compliance to the system when under compression. *Id.* ¶30. [4]

When the system is under compression, the rings themselves deform into a smaller shape, creating additional volume to accommodate the excess volume that exists. *Id.*, ¶31. When the compliance rings are compressed, the excess fluid flows into the space adjacent to the compliance rings, as described by Mr. Girard. *Id.* ¶¶31-33. In the illustration below,



_____

[4] Defendant never expressly conceded these "compliance rings" are filled with a gas, but the only way for rings to provide compliance is to be filled with a gas. *See* Dasi Decl. [Dkt. 24-2] ¶27 (compliance "absorbs pressure changes"); ¶93 (fluid cannot "dampen the effects of pressure changes"); ¶21 (prior art "compliance" used "an excess volume of air" to "compress or expand to absorb the shocks to the fluid."); p.37 at n.18 (describing rings as "air bubble"); *see also* Girard Decl. ¶24S.

the excess volume is identified in yellow:

The "excess volume area" is the area within the tubes that is occupied by gas when the system is not under compression and is occupied by the excess volume of test fluid when the system is under compression. ViVitro's compliance rings provide the same excess volume area and compliance function described in claim 1 of the '935 Patent. *See* Part I.B above. Thus, the excess volume area is in direct communication with the fluid in the fluid return chamber as described in the '935 Patent.  Girard Decl. ¶30.

The fact that the compliance rings use a membrane to separate the gas from the test liquid does not take them outside the scope of the '935 Patent; it is expressly described therein: "The air or other gas may be indirect [sic] contact with the working fluid in the test chamber 106 *or a membrane may be provided* within the compliance chamber 135 *to separate the air or gas from the working fluid*…." '935 Patent at 9:20-28 (emphasis added). "In each case, the purpose of the compliance chambers is to act as a resilient spring force to dampen the effects of large, quickly changing pressure gradients within the test chamber 106." *Id*.; *see also id.* at 12:33-35 ("In addition to merely containing a volume of air or other gas to act as an air spring, a membrane could be provided between the liquid and the air or other gas…."). The ADC Heart Valve Durability Tester meets all limitations of independent claim 1.

The ADC Heart Valve Durability Tester further meets the limitations of dependent claims 2-3, 8-9 and 12. *See* Girard Decl. at 14:1-19:17.

### 3. The '935 Patent is Presumptively Valid, and None of ViVitro's Cited Art Raises a Substantial Question, Because It Teaches Away and Involves Fundamentally Different Systems

The '935 Patent is "presumed valid . . . at every stage of the litigation." *Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc*., 134 F.3d 1085, 1088 (Fed. Cir. 1998). The Federal Circuit has noted that a "patent enjoys the same presumption of validity during preliminary injunction proceedings as at other stages of litigation." *Titan Tire, Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009) (internal citation omitted). If "the alleged infringer does not challenge validity, the very existence of the patent with

1  its concomitant presumption of validity satisfies the patentee's burden of showing a

2  likelihood of success on the validity issue." *Id.*

3      "At trial, the party challenging validity must prove that the claims are invalid by

4  clear and convincing evidence." *Polara Eng'g, Inc. v. Campbell Co*., 894 F.3d 1339, 1348

5  (Fed. Cir. 2018). To oppose a preliminary injunction, the accused infringer must establish

6  a "substantial question" of invalidity, bearing in mind the clear and convincing burden

7  that will apply to it at trial. *Titan Tire*, 566 F.3d at 1379-80. Although a "substantial

8  question" need not rise to the level of clear and convincing evidence, it must be enough

9  for the Court to conclude that Defendant is "more likely than not" to satisfy its clear and

10  convincing evidence burden by the time trial comes. *Id*.

11      This case was originally filed in Colorado prior to transfer to this District.  In

12  response to BDC's motion for preliminary injunction in Colorado, ViVitro compared two

13  prior art durability testers—the Dynatek M6 and the Xi patent application—to the '935

14  Patented invention. The art cited by ViVitro in its prior response fails to rise to this

15  standard.  All three are heart valve durability testers, but they operate in completely

16  different ways. The Xi system uses a piston to drive the prosthetic heart valve up and

17  down through the fluid to cause the valve to open and close. Girard Decl. ¶37 & Ex. G at

18  7-8. ViVitro has not, and cannot, contend that the Xi system anticipates the '935 Patent.

19  The Dynatek M6 system from 1993 uses a swashplate design, essentially moving fluid by

20  using a see-saw type mechanism—like sloshing water in a bowl—but keeping the overall

21  system pressure the same, with no net compression. Girard Decl. ¶¶39-41 & Ex. H at 7-

22  8. Quite simply, if there is no compression, there can be no claimed excess volume area

23  as described in the '935 Patent.

24      In its Colorado brief, ViVitro pointed to a "capacitance tank" in Dyanatek that it

25  claimed operates as an excess volume area. Even a cursory review will demonstrate this

26  is not so. The capacitance tank is connected by 1/8 inch tubing that is 5 feet in length. Ex.

27  H at 10, 12 ¶6. This tubing is approximately the same diameter as the charging cord for

28  an iPhone; it is too narrow and too long to allow for passage of fluid during the accelerated

cycles performed by the tester, *i.e.*, 200-800 times per minute. Girard Decl. ¶47. Indeed, this design actually teaches away from use of a capacitance tank as an excess volume area, as claimed in the '935 Patent, because it teaches use of a structure that, as a matter of ordinary physics, could not accomplish that function. *Id.*, ¶48; *Gator Tail, LLC v. Mud Buddy LLC*, 618 F. App'x 992, 998 (Fed. Cir. 2015) ("[W]here a reference teaches away from the claimed invention, the patents are more likely to be non-obvious."); *see also Arctic Cat Inc. v. Bombardier Rec. Prods.*, 876 F.3d 1350, 1360 (Fed. Cir. 2017). Moreover, the Dynatek manual instructs that air should be removed from the system, because the presence of air or gas (which would enable an excess volume area) is *detrimental* to operation of the testers. *See generally* Girard Decl., Ex. H. None of the identified references, either alone or in combination, satisfy ViVitro's heavy burden to prove invalidity. *See e.g.*, *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1562 (Fed. Cir. 1988); 35 U.S.C. § 282.

### B. BDC Will Suffer Irreparable Harm If the Infringement Is Not Stopped

BDC must show that absent an injunction, it will suffer irreparable harm and that a causal nexus between the harm and infringement exists. *See Metalcraft*, 848 F.3d at 1368. "Where the injury cannot be quantified, no amount of money damages is calculable, and therefore the harm cannot be adequately compensated and is irreparable." *Id*. In the context of patent infringement, lost market share, lost research and development opportunities, injury to reputation and goodwill, and price erosion are all valid grounds for finding irreparable harm. *Celsis in Vitro, Inc., v. CellzDirect, Inc*., 664 F.3d 922, 930 (Fed. Cir. 2012); *Mylan Inst. LLC v. Aurobindo Pharma Ltd*., 857 F.3d 858, 872 (Fed. Cir. 2017); *Aria Diagnostics v. Sequenom, Inc.*, 726 F.3d 1296, 1304 (Fed. Cir. 2013); *Bosch*, 659 F.3d at 1153-55.

ViVitro's threatened launch of the ADC Heart Valve Durability Tester presents irreparable harm, unless this launch is stopped before it begins. BDC has been, and is, the clear market leader for a testing system with a fluid test chamber for accelerated cyclic pressure testing. Defendant's ADC Heart Valve Durability Tester was designed and

intended to compete directly with BDC's fluid test chamber. Indeed, ViVitro has copied not just BDC's durability tester but also its service options, showing that ViVitro recognizes BDC as a key competitor it seeks to displace. Weinberg Decl., ¶30. This is "one factor suggesting strongly the potential for irreparable harm." *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 653-54 (Fed. Cir. 2015) (citation omitted); *see also Douglas Dynamics, LLC v. Buyers Prods. Co*., 717 F.3d 1336, 1345 (Fed. Cir. 2013) (harm suffered "where two companies are in competition against one another" is "often irreparable"); *Presidio Components, Inc. v. am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012) (same).

### 1. Loss of Market Share

Lost market share constitutes irreparable harm, particularly where that lost share is difficult to reverse or quantify due to "incumbency effects," (i.e., markets where customers prefer to remain with an incumbent supplier). *Broadcom Corp. v. Emulex Corp*., 732 F.3d 1325, 1336 (Fed. Cir. 2013). That is precisely the case here. As described above, a company typically purchases multiple systems from a single supplier and uses them for many years. If ViVitro were permitted to start distributing its infringing product, it could have a decades-long effect on BDC. Weinberg Decl., ¶18.

If BDC loses market share now the lost customers will be lost for the foreseeable future. In the medical device test systems market, a customer's first purchase is for the purpose of running a pilot testing program. If the pilot test is successful, the customer will then purchase more of the same test systems from the same manufacturer as part of a larger testing program for commercial use. *Id*. Once these purchases have been made, it could be up to fifteen years before the customer is in the market to purchase a test system again. Therefore, if Defendant is not enjoined now, customers running pilot programs may permanently switch to Defendant, and BDC will irreparably lose its position in the market place for the foreseeable future. *See Mentor Graphics Corp. v. Eve-USA, Inc.*, 2015 U.S. Dist. LEXIS 33610, at *8-9 (D. Or. Mar. 17, 2015) (finding irreparable harm where the "patentee is prevented from making future sales during the lifecycle" of the

product due to "goodwill gained from the first infringing sale"). It is also impossible to calculate the losses associated with that long-term stream of revenue, both due to the long-term and compounding nature of the harm, and because a variety of external factors make it extremely difficult or impossible to predict which follow-on sales would have occurred for a particular lost customer.

To make matters worse, the market for heart valve durability testing systems is small. BDC's systems' pricing starts between $75,000 and $85,000, but BDC sells under 40 systems a year. These systems annually result in 70-75% share of the worldwide market. Weinberg Decl., ¶16.  Accordingly, even a handful of sales of Defendant's infringing system will harm BDC's relationships with customers, harm its reputation as an innovator with a unique product, reduce its research and development activities, and permanently erode its prices (these harms are discussed further below). In such a market, BDC cannot simply be put back into position at the end of trial. *See Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975-76 (Fed. Cir. 1996) ("[Y]ears after infringement has begun, it may be impossible to restore a patentee's [] exclusive position by an award of damages and permanent injunction."). Indeed, the entire value of BDC's patents is to protect its exclusive position in the market. *See, e.g., Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1314 (Fed. Cir. 2012) ("A patentee's right to exclude is a fundamental tenet of patent law.").

## 2. Reputational Harm

The Federal Circuit has stated that a company's "reputation as an innovator will certainly be damaged if customers found the same 'innovations' appearing in competitors' [products]." *Douglas Dynamics*, 717 F.3d at 1344-45. Thus, courts have found irreparable injury where "infringing products in the marketplace would damage" a patentee's "reputation as an innovator and diminish the appearance of viability to its customers." *Trading Techs. Int'l., Inc. v. eSpeed, Inc.*, 2008 U.S. Dist. LEXIS 86953, at *9 (N.D. Ill. May 22, 2008).

As explained above, BDC has invested significantly, not only to develop its

patented technology, but to promote it in a way that enhances its reputation. These efforts have resulted in widespread industry acclaim from customers, which have stated that:

- "[BDC's] testing is more likely to meet dynamic regulatory requirements"
- "BDC is a true partner with our R&D team"
- "The novel design and implant location of [a customer's] device meant that standard reliability testing equipment was not applicable. Custom equipment designed from scratch would be required. Working with BDC, we were able to quickly build a test fixture . . . ."
- "[BDC is] an excellent thought partner in problem solving."

*Client Testimonials*, http://www.bdclabs.com/about-us/client-testimonials/ (visited June 23, 2023). Contributing to BDC's reputation for innovation is the fact that the VDT-3600i was a differentiated product for heart valve testing—it was the only type of machine on the market. In fact, the VDT-3600i became the "industry standard."

However, BDC's VDT-3600i is no longer a differentiated product given the presence of Defendant's infringing system in the market. Once lost, BDC's reputation cannot be regained and cannot be compensated through money damages. The foregoing demonstrates precisely the type of harm that warrants injunctive relief. *See Douglas Dynamics*, 717 F.3d at 1345 ("erosion in reputation and brand distinction" from "being forced to compete against products that incorporate and infringe its own patented inventions" constitutes irreparable harm).

### 3. BDC Will Lose Incalculable Sales of Related Products/Services as a Result of Defendant's Infringement

A heart valve tester is not a stand-alone device; it must be integrated with a novel test system and other functionally related products. Customers who choose to buy Defendant's product are likely to end up purchasing fully-integrated machine and line solutions from Defendant. Defendant's sales will not only adversely affect sales of BDC's system, but also BDC's related products and services, such as catheter testing, stent and graft testing, and heart valve testing. Weinberg Decl. ¶32.   Courts have found that

damages related to sales of functionally related products, also known as convoyed sales, are "both irreparable and difficult to quantify." *Baker Hughes Inc. v. Nalco Co.*, 675 F. Supp. 2d 547, 554 (S.D. Tex. 2009) (granting preliminary injunction where reputational damage could immeasurably harm ability to sell related products).

### 4. BDC's Grant of a License to TAI Does Not Defeat Irreparable Harm

ViVitro will invariably argue that BDC's previously licensing the '935 Patent counters any irreparable harm. Patent holders are granted exclusive authority to grant licenses and to refuse licenses; such that a patent holder could license to small non-threatening operations, but refuse to license to a competitor that could run the patent holder out of business. "A plaintiff's past willingness to license its patent is not sufficient per se to establish lack of irreparable harm." *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328-29 (Fed. Cir. 2008); *see also Layne Christensen Co. v. Bro-Tech Corp.*, 871 F. Supp. 2d 1104, 1118 (D. Kan. 2012) (granting injunction despite licenses to third parties); *Waterton Polymer Prods. USA, LLC v. EdiZone*, LLC, 2015 U.S. Dist. LEXIS 32830 (D. Utah Mar. 16, 2015) (same). In *Acumed*, the Federal Circuit affirmed the lower court's finding of irreparable harm despite the plaintiff having licensed the patent before, particularly where the court considered the previous licenses and distinguished them, including how one previous license was part of a settlement agreement and the other previous license was to an entity that was not a direct competitor. 551 F.3d at 1328-29.

Just as in *Acumed*, the license to TAI that was granted as part of a settlement of a litigation does not bar injunctive relief against ViVitro because ViVitro's Accused Product is unique and TAI's product does not represent the same competitive risk as Defendant's Accused Product. Specifically, TAI is a large company with many types of equipment for testing products not exclusive to the medical device industry (i.e., batteries, biopharma, electrodes, pharmaceuticals and medical devices). Weinberg Decl. ¶26. TAI offers only one product related to testing of heart valves, and does not offer testing services of the type offered by BDC and Defendant. *Id*. Further, TAI does not have the

reputation and credibility in the heart valve testing industry enjoyed by BDC and ViVitro. *Id*. In other words, TAI does not threaten BDC's market share or patented rights in any way. By contrast, ViVitro is a greater competitive threat because it has been well-known in the market for heart valve testing since the 1990s. *Id*., ¶27. Accordingly, ViVitro's entry into the market with the Accused Product has substantial ramifications compared to TAI; the Court should reject any argument by ViVitro on this basis in attempt to defeat BDC's request for injunctive relief.

### C.    The Balance of Equities Favors Entry of a Preliminary Injunction.

In balancing the parties' harms, "a district court 'must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted.'" *Bird-B-Gone Inc. v. Bird Barrier Am., Inc.*, 2013 U.S. Dist. LEXIS 191316, at *21 (C.D. Cal. Mar. 20, 2013) (quoting *Hybritech Inc. v. Abbott Labs*., 849 F.2d 1446, 1457 (Fed. Cir. 1988)). This factor heavily favors a preliminary injunction.

First, as demonstrated, the likelihood of success on BDC's infringement case is very high. This is an "equitable factor" that favors BDC "in the ultimate balance of the equities." *Revision Military*, 700 F.3d at 526. Second, BDC has shown it has much to lose if preliminary injunctive relief is not granted due to the head-to-head competition with its own technology embodied in Defendant's ADC Heart Valve Durability Tester. Third, any harm Defendant may claim from entry of an injunction would be minimal—since to BDC's knowledge it has not yet delivered any products and does not appear to have made any sales in the U.S.—and in any event is self-inflicted by the calculated risk it undertook in entering the marketplace with a copycat concept with full knowledge of the '935 Patent and BDC's strong belief that commercializing the ViVitro ADC Heart Valve Durability Tester would constitute infringement. This natural consequence of infringing activity does not weigh against issuance of an injunction. *See Apple, Inc. v. Samsung Elecs. Co*, 2012 U.S. Dist. LEXIS 88436, at *2 (N.D. Cal. June 26, 2012) ("[O]ne who elects to build a business on a product found to infringe cannot be heard to complain"); *see also Celsis*,

664 F.3d at 931 (granting injunction when defendant's harm was "the result of its own calculated risk in selling a product with knowledge of [the plaintiff's] patent"); *i4i Ltd. P'ship, v. Microsoft Corp.*, 598 F.3d 831, 863 (Fed. Cir. 2010) ("[N]either commercial success, nor sunk development costs, shield an infringer from injunctive relief…. [The infringer] is not entitled to continue infringing simply because it successfully exploited its infringement."). Moreover, the ViVitro ADC Heart Valve Durability Tester will first be delivered in fall of 2023 (and not in the United States), so any harm to Defendant would be minimal. *See Bird-B-Gone Inc.*, 2013 U.S. Dist. LEXIS 191316, at *21 ("a preliminary injunction enjoining non-existent sales will not harm Defendant"); *Tuf-Tite, Inc. v. Fed. Package Networks, Inc.*, 2014 U.S. Dist. LEXIS 163352, at *26 (N.D. Ill. Nov. 21, 2014) (balance of harms favor patentee where infringer "has only recently entered the market").

### D.    The Public Interest Favors Entry of a Preliminary Injunction

The Federal Circuit has indicated that courts should be more likely to grant an injunction "in traditional cases, such as this, where the patentee and adjudged infringer both practice the patented technology." *Bosch*, 659 F.3d at 1150. Further, "the public generally does not benefit when that competition comes at the expense of a patentee's investment-backed property right." *Apple*, 809 F.3d at 647.

### E.    Bond

District courts have broad discretion to determining the amount of bond. *Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991). BDC's infringement case is strong. ViVitro is only just beginning to make inroads into the domestic market. Any potential lost profits to ViVitro at this early stage are still likely small, and bond should not exceed $10,000.

# IV.   CONCLUSION

BDC respectfully requests that this Court enter a preliminary injunction prohibiting Defendant from infringing the '935 Patent, as described in the proposed order, and for such other relief this Court deems just and proper.

Respectfully submitted this 26th day of June, 2023.

DORSEY & WHITNEY LLP


By */s/ Gregory S. Tamkin*
Gregory S. Tamkin
Shannon L. Bjorklund
Maral J. Shoaei

Attorneys for Plaintiff Biomedical Device
Consultants & Laboratories of Colorado, LLC

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Plaintiff BDC, certifies that this brief contains __5,522__ words, which:

___ complies with the word limit of L.R. 11-6.1.

_**X**_ complies with the word limit set by the Court's Standing Order issued June 13, 2023 (5,600 words).

_/s/ Gregory S. Tamkin_
Gregory Tamkin

CERTIFICATE OF COMPLIANCE                                     NO. 2:23-CV-04291

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on counsel of record via ECF Notice of Electronic Filing in accordance with the Federal Rules of Civil Procedure and Local Rule 5-3.3.

I have caused to be served the under-seal version of this filing on counsel for Defendant via email, at the following addresses:

> Jeffrey H. Grant (SBN 218974)
> *jgrant@foxrothschild.com*
> FOX ROTHSCHILD LLP
>
> Warren J. Thomas (admitted *Pro Hac Vice*)
> *wthomas@mcciplaw.com*
> John W. Harbin (admitted *Pro Hac Vice*)
> *jharbin@mcciplaw.com*
> MEUNIER CARLIN & CURFMAN LLC

Dated: June 26, 2023

> */s/ Gregory S. Tamkin*
> Gregory Tamkin